1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   Sandra and Bernard Fulayter,        )    No.  CV06-1435-PCT- NVW
                                        )
10            Plaintiffs,               )
                                        )
11   vs.                                )    **ORDER**
                                        )
12                                      )
    Prudential  Insurance  Company  of  )
13   America,                           )
                                        )
14            Defendant.                )
   _____    )

15

16        Pending before the court is Plaintiffs' Motion for Summary Judgment (Doc. # 20).

17   **I.    Background**

18        In this action, the plaintiffs challenge a termination of long-term disability benefits

19   under an employee insurance plan governed by the Employee Retirement Income Security

20   Act ("ERISA").  The following facts are undisputed.

21        **A.    Fulayter's Disability**

22        Plaintiff Bernard Fulayter was involved in a tragic accident in Wisconsin on

23   December 28, 1997, when a sled occupied by himself and his grandson collided with a tree.

24   The impact instantly killed Fulayter's grandson, broke Fulayter's pelvis, and seriously

25   impaired the function of Fulayter's right leg and foot by damaging nerves in his lumbosacral

26   plexus.  Age 53 at the time, Fulayter spent the following month in intensive care and

27   rehabilitation. Two six-inch bolts were utilized to stabilize fractures on the right side of his

28   pelvis, and a metal plate was inserted across his tail bone for support.  Fulayter was also

required to wear a brace on his right foot.  The injuries caused chronic pain in his pelvis, right leg, and foot and made it difficult for him to walk or stand for prolonged periods. Neurontin, Endocet, and ibuprofen were all prescribed for pain management.

Several years later, on January 15, 2003, Fulayter saw Victoria Yorke, M.D., for evaluation after experiencing neck and shoulder pain apparently unrelated to his sledding accident.  Dr. Yorke noted that Fulayter had problems with severe degenerative arthritis, depression, obesity, probable carpal tunnel syndrome, hypertension, hyperlipidemia, and cervical strain.  Imaging tests subsequently conducted at Dr. Yorke's request by Gary Herzog, D.O., revealed severe degenerative disc and bone disease in the upper portion of Fulayter's spine.  A.R. at 199.

Upon Dr. Yorke's recommendation, Fulayter received electromyogram and nerve conduction studies on his right lower extremity from Santosh K. Bahal, M.D., on February 20, 2003.  Dr. Bahal noted that Fulayter complained of pain in his lower back and experienced difficulty working because of progressive atrophy in his right foot.  Dr. Bahal also observed that Fulayter's foot brace had become difficult to use, that Fulayter walked with an "abnormal gait pattern," and that the hardware originally implanted in Fulayter's pelvis had become loose.  A.R. at 201.  The right leg was described as shorter than the left and as suffering from hair loss, while the right foot was described as cold, deformed, discolored, and markedly everted.  From these observations and the results of the nerve conduction studies, Dr. Bahal found severe loss of nerve function throughout Fulayter's right lower extremity consistent with reflux sympathetic dystrophy ("RSD"), a condition involving chronic, severe pain caused by an exaggerated response of the sympathetic nervous system to injury.

Fulayter made a second visit to Dr. Bahal on March 3, 2003.  He described the typical feeling in his right leg as a burning, intractable pain that increased in severity with prolonged activity or inactivity and cold weather.  At its worst, the pain was "about 9 on a scale of 1:10."  A.R. at 211.  Dr. Bahal noted that Fulayter managed to work despite the condition, but, because of limited mobility, could "only function in an office situation where he could

do phone calls, etc." A.R. at 211. It was also explained that Fulayter required the use of a cane to walk and often tripped because of the deformity in his right foot. Based on his observations and a review of the medical record, Dr. Bahal diagnosed Fulayter with class IV reflex sympathetic dystrophy. The following conclusions were also recorded:

> In my opinion, this patient has severe involvement of the autonomic and peripheral nervous system.
>
> In my opinion, this patient should apply for Social Security Disability benefits and he should be approved. Reflex sympathetic dystrophy is a very disabling condition that leaves the patient with burning pain and inability to function. This patient is very well-motivated and I am really surprised as to how he has done the telephone and a desk job.

A.R. at 213. Because Fulayter was taking Neurontin, ibuprofen, Endocet, and Percocet for pain, Dr. Bahal referred him to Bhupinder S. Bolla, M.D., for spinal cord stimulator insertion, a pain-management treatment that could substitute for Fulayter's substantial reliance on medication.

During his subsequent visit to Dr. Bolla on April 1, 2003, Fulayter reported "sharp, burning, shooting, knife-like, numbing, deep, achy pain" in his pelvis and right lower extremity, but explained that his medication typically reduced his pain to the level of "1/10." A.R. at 227. Because Fulayter declined to receive a spinal cord stimulator insertion due to a preference for oral pharmacological pain management, Dr. Bolla prescribed a patch containing the powerful narcotic Fentanyl, continued use of Endocet and Neurontin as needed, and six weeks of physical therapy. Fulayter later reported that the combination of physical therapy and the Fentanyl patch improved the range of motion in his lower right leg and reduced the leg's sensitivity by at least fifty percent.

### B.    Fulayter's Employment

At the time of his accident, Fulayter was employed as a security manager for Patrick Cudahy, Inc. ("Cudahy"), a subsidiary of Smithfield Foods, Inc., that supplies processed meats to grocers. Due to his injuries, however, he became unable to meet the physical demands of the job, which typically required him to walk substantial distances and stay on his feet for lengthy periods of time.

1    Fulayter obtained a position as a purchasing agent with Cudahy in early 1998 in an

2    effort to accommodate his new physical limitations.  This position required him to negotiate

3    pricing and place orders with suppliers for labels and plastic wrappers.  Fulayter was also

4    responsible for recording and maintaining inventory, an aspect of the job that required him

5    to walk substantial distances.  To control his chronic pain, Fulayter continued to take

6    Neurontin, Endocet, and ibuprofen.

7    After approximately five years as a purchasing agent, Fulayter concluded that he was

8    no longer able to carry out his employment duties due to his physical condition.  He stopped

9    working in February 2003, around the time when he started seeing Dr. Bahal.  Soon

10   thereafter, the Social Security Administration found him disabled as of February 20, 2003,

11   and awarded $1,552 in monthly disability benefits.  Fulayter officially ceased working at

12   Cudahy in May 2003 and moved with his wife permanently to Bullhead City, Arizona, to

13   escape the cold weather that often aggravated his condition in Wisconsin.

14   **C.    Fulayter's Insurance Plan**

15   Shortly before moving to Arizona, Fulayter filed for long-term disability benefits

16   under the Smithfield Foods, Inc., group disability insurance plan ("the Plan") administered

17   and funded by Defendant Prudential Insurance Company of America ("Prudential").

18   Fulayter was enrolled in the Plan at the time of his injury in 1997 and during his employment

19   as a purchasing agent.  For the purposes of an initial benefits determination, the Plan defines

20   "disabled" as follows:

21   [An enrollee is] disabled when Prudential determines that:

22   •    [he is] unable to perform the material and substantial
23        duties of [his] regular occupation due to [his] sickness or
     injury; and

24   •    [he has] a 20% or more loss in [his] indexed monthly
     earnings due to that sickness or injury.
25

26   After an employee has been deemed to fall under this definition and has received 24 months

27   of disability payments, continued eligibility for payments is determined in accordance with

28   a narrower definition of "disabled."  According to this second definition, an employee is only

disabled and entitled to benefits "when Prudential determines that due to the same sickness or injury, [he is] unable to perform the duties of any *gainful occupation* for which [he is] reasonably fitted by education training or experience." A.R. at 39. Various components of the two definitions are in turn defined as follows:

> *Material and substantial duties* means duties that:
>
> - are normally required for the performance of your regular occupation; and
>
> - cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.
>
> *Regular occupation* means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.
>
> *Gainful occupation* means an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 55% of your indexed monthly earnings within 12 months of your return to work.
>
> *Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.
>
> *Injury* means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

*Id.* To determine whether an enrollee is disabled under the relevant definition, Prudential reserves the right to "require [an enrollee] to be examined by doctors, other medical practitioners or vocational experts of [its] choice." *Id.* An ERISA Statement that is attached to the Group Insurance Certificate further provides that Prudential "as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator," the Statement continues, "shall not be overturned unless arbitrary and capricious." A.R. at 63.

1          **D.      The Termination of Benefits**

2          Prudential initially denied long-term disability coverage in a letter dated June 10,

3    2003, on the ground that Fulayter "possess[ed] the physical functional capabilities to perform

4    the material and substantial duties of [his] occupation." A.R. at 264. This conclusion was

5    reached on the reasoning that because Fulayter worked as a purchasing agent from early 1998

6    to February 23, 2003, without interruption due to disability, and because there was no

7    indication that his condition had changed since that time, there was little reason to believe

8    that he could not continue to work. Fulayter appealed the decision on August 26, stating that,

9    at any given point, he was disabled either because of severe pain or the narcotic effects of his

10   medication. Fulayter cryptically added that he continued working from 1998 to 2003 only

11   because of "the circumstances of [his] accident," not because he had healed. A.R. at 272.

12   Attached to the appeal was a letter from Dr. Bahal stating that Fulayter is "totally and

13   permanently disabled" and that Dr. Bahal did "not believe that [Fulayter] will be able to do

14   any type of work, even sedentary work due to side effects from medication, impaired

15   memory, and low back pain which increases with sitting." A.R. at 271.

16         Prudential evaluated the appeal by reviewing Fulayter's medical record and

17   descriptions of his employment. A letter obtained from Cudahy explained that Fulayter's

18   position as a purchasing agent had required him to take "at least weekly trips to various

19   production areas" in a plant with "over 1.5 million square feet on four floors" and "no man

20   elevators and many stairs to climb." A.R. at 276. Cudahy further explained that Fulayter had

21   to traverse a "significant distance" and navigate "a number of stairs" in order to reach his

22   work station from the parking lot. *Id.* Based on Cudahy's input and the letter from Dr.

23   Bahal, Prudential reversed its initial denial of long-term disability benefits on October 27,

24   2003. The reversal entitled Fulayter to a monthly disability payment of $905.50,

25   retroactively effective as of May 25, 2003.

26         Fulayter had no further contact with Prudential for nearly two years after he moved

27   to Arizona. However, he continued to receive frequent medical attention, including an

28   ultrasound, a colonoscopy, cholesterol tests, and an eye exam. On June 11, 2004, Fulayter

received an x-ray of his right foot.  The report from this test states that although the "osseous elements of the foot reveal no acute abnormality, there is "increasing sclerosis of the fifth metatarsal with cortical thickening."  A.R. at 304.  Further, it was noted that although no "frank destructive process is identified . . . [d]egenerative changes are present at the first and second metatarsal-tarsal joints."  *Id.*  Fulayter's physician concluded from these observations that Fulayter has degenerative joint disease in his right foot and possibly Paget's disease, a condition in which an individual's bone gradually becomes soft and weak, often leading to bone pain, deformities, and fractures.  In the summer of 2004, Fulayter also received an orthotic device from his podiatrist to alleviate pain related to a small plantar heel spur in his right foot.  Pain in Fulayter's left hip and right foot was reported as "uncontrolled but improved" after his use of this new device.  A.R. at 341.  Fulayter's lower back pain was described as "chronic" but "controlled" with Oxycodone.  *Id.*

On January 14, 2005, Fulayter received another routine checkup for his various conditions.  The report from this visit, authored by Edna M. Harris, a family nurse practitioner who supplied much of the information in Fulayter's latest medical records, lists Fulayter's pain as "0" and indicates that Fulayter had a full range of motion in his extremities.  The record further indicates that all of Fulayter's conditions were "stable except . . . [that Fulayter had] been splitting [his] Percocet in half" to "take the edge of the pain off" without becoming "dopey the next day."  A.R. at 329.  Fulayter obtained a refill on his Percocet prescription for "chronic low back/L hip/R foot pain" during this visit.  *Id.*

A claims manager at Prudential examined Fulayter's file as part of a periodic case review on January 28, 2005.  The manager noted in an internal memorandum that because Fulayter has "documented chronic intractable pain" and "all the conditions mentioned in his medical records are progressive in nature," he "would be extremely unlikely" to obtain gainful employment "no matter what his education and experience."  A.R. at 285.  For this reason, the claims manager recommended approving the continued distribution of disability benefits under the Plan's initial, broad definition of "disabled."

Fulayter's fortune changed soon thereafter.  On February 2, 2005, Prudential notified him that, as provided in the Certificate of Insurance, his eligibility for disability benefits would be determined in accordance with the narrow definition of "disabled" upon the expiration of the 24-month payment period on May 24, 2005.  Based on that definition and in light of the latest medical records, Carrie Eccles, Prudential's claim manager and a registered nurse, concluded in an internal memorandum dated May 18, 2005, that there is "no documented impairment that would prevent [Fulayter] from sitting on a continuous basis with the capability for self-accommodation."  A.R. at 346.  Eccles listed several points in support of this conclusion:  First, she explained there was "[n]o indication of any ambulation abnormalities" or new documentation of the symptoms of reflux sympathetic dystrophy.  *Id.* Second, she noted that Fulayter reported no pain during two visits to doctors in August 2004 and January 2005.  Third, she noted that Fulayter's pain was likely manageable because he had independently reduced his dosage of Percocet and had not ordered any refills since the medication was last prescribed in January 2005.

In light of Eccles's assessment, Prudential concluded that Fulayter could perform "a variety of sales occupations that involve prolonged standing/walking" and proceeded to conduct an employability assessment based on his qualifications.  A.R. at 349.  An internal memorandum authored by Gregg Schwartzkopf on May 24, 2005, stated that Fulayter's education and prior work experience had provided him with "transferrable skills" in "planning/directing activities," "making independent judgments," "dealing with/influencing people," and "multitasking."  *Id.* Utilizing software that considered these skills to determine job possibilities, Fulayter was found to be reasonably employable as either a telephone solicitor at $14.06 per hour or a "supervisor/order taker" at $23.15 per hour for unidentified businesses approximately 100 miles away in Las Vegas.  *Id.* The joint effect of the Eccles and Schwartzkopf memoranda was that Fulayter did not meet the narrow definition of "disabled" in the insurance Plan.  Prudential sent a letter to Fulayter to this effect on May 25, 2005, and terminated benefits.  The letter explained:

> Our review of your medical records from the previous year and into this year do not reveal any significant impairment. Your physician does not document any physical examination findings with the exception of the ½ inch height discrepancy on standing of your right and left shoulders. On August 4, 2004 and January 5, 2005 you described your pain as zero out of ten. Your range of motion was full at all examinations. No skin changes in color of [sic] temperature were noted. There is no documentation of Reflex Sympathetic Disorder (RSD). You decreased your dose of Oxycodone/Acetaminophen 5 mg/325 mg to ½ the dose. This was already a very lose dose of pain medication. There was no indication of cognitive deficits or abnormal thought processes. There was no mention of any ambulation abnormalities. . . . In review the medical documentation does indicate that prolonged walking or standing would be difficult and would not be recommended. However, there is no medical documentation that would support that you would be unable to perform a sedentary job where you could get up as needed to be comfortable.

A.R. at 352.

Fulayter appealed Prudential's decision on June 9, 2005, explaining that he could not work because his medications made him sleepy, and because of varying levels of pain in his pelvis, leg, and foot. Enclosed with the appeal was a statement from Edna Harris stating that Prudential had terminated benefits based on a misinterpretation of the medical records. Harris explained that although she did not document the pain in Fulayter's back, right groin, and right ankle at each visit, she only omitted that information because it was beyond the scope and purpose of many of the visits, rather than because those conditions were no longer present. Harris continued:

> I also neglected to mention that patient only has full [range of motion] of extremities when wearing the ankle brace. Further when the [record] states pain is stable, it does not mean it is controlled but that it is at a tolerable level only. . . .

> In an 8-hour work day the patient can stand walk [sic] about 15-20 min at one time for a total of 0-2 hrs due to pain to patients [sic] back and right hip/groin, right ankle and to calluses on the right foot increases [sic] and patient has to change from standing to sitting and visa [sic] versa every 15-20 minutes due to pain in the lower back and right hip. This restriction precludes the patient from doing any job that does not allow him the freedom of changing from sitting to standing position at least every 20 min. . . .

> The patient would need assistance or direction to properly care for his work, training, and/or educational affairs due to his pain

- 9 -

1

> medication (Oxycodone 5 MG/APAP 325 MG QID) causing
> drowsiness, making it hard for him to concentrate, and starting
> to affect the patient's short-term memory.

2

3   A.R. at 356-57.

4   Prudential responded to the appeal by conducting an internal medical records review.

5   One of Prudential's physician reviewers, identified only as "Dr. K," opined on July 14, 2005,

6   that "there is a 60-70% chance that [Fulayer] . . . does have sufficient impairment from his

7   condition that would prevent him from performing his sedentary occ[upation]." A.R. at 377.

8   Two other physician reviewers concluded otherwise:  Interpreting the medical record

9   authored by Edna Harris on January 14, 2005, one "Dr. Bachman" found that Fulayter's

10  reflux sympathetic dystrophy "seems to have resolved" and that he has "no difficulty

11  ambulating." A.R. at 378.  Dr. Bachman concluded that "while [Fulayter] has multiple

12  medical conditions, none of them individually or combined rise to a level of medical

13  impairment that would preclude a sedentary occupation." *Id.*  An individual identified as

14  "Dr. Fallon" similarly found that there were no indications of "chronic changes" in Fulayter's

15  condition and that the "intensity and frequency of treatment" did not support a finding of

16  impairment sufficient to preclude sedentary employment.  A.R. at 385.  Dr. Fallon's

17  conclusions were based exclusively on the report from a CT scan performed by Dr. Mark

18  Ellis on July 7, 2005.  A.R. at 369.  Siding with Dr. Bachman and Dr. Fallon, Prudential

19  upheld the termination of benefits on August 12, 2005.

20  Fulayter appealed again on August 29.  In handling this second appeal, Prudential

21  made several efforts to ascertain further the nature of Fulayter's condition.  First, Prudential

22  required Fulayter to complete an Activities of Daily Living Questionnaire in September

23  2005.  In complying with this request, Fulayter explained that he has "severe pains" in his

24  right foot, little strength in his ankle, and broken hardware and swelling in his pelvis that

25  creates problems when he sits.  Other illuminating facts reported in the questionnaire are the

26  following:  Fulayter needs help dressing and grooming; his short-term memory is impaired;

27  he takes two tablets of ibuprofen and two to three tablets of Endocet each day for pain; he

28  uses airport courtesy wheelchairs when he travels by air; he drives approximately four times

1  per week, for distances of up to 50 miles; he takes out the trash; he requires the assistance
2  of a cane or grocery cart when he goes shopping; he reads books and watches television four
3  to six hours per day and plays cards for up to four hours at a time.

4        Prudential next hired the Research Consultants Group, Inc. ("Research Consultants"),
5  to investigate whether Fulayter's daily activities were consistent with his claim of disability.
6  Video surveillance subsequently obtained by Research Consultants in the fall of 2005
7  revealed that Fulayter was at least capable of walking his dog within his yard, bending down
8  to retrieve his newspaper, and hauling his trash cans into his garage.  According to one
9  surveillance report, Fulayter also had no outward signs of injury or disability.  Neighbors
10 interviewed by Research Consultants erroneously reported that they had seen Fulayter mow
11 his lawn.  Prudential did not follow up with Fulayter to ascertain the accuracy of these
12 reports.

13       Finally, Prudential hired Karyn J. Akey, M.D., a board-certified family practitioner,
14 to conduct an independent review of its decision terminating benefits.  Dr. Akey concluded
15 that although the "medical data documents objectively that [Fulayter] has had persistent
16 limitations resulting from a lumbar plexus injury sustained in December, 1997," there were
17 multiple reasons to doubt that his medical condition deteriorated since he left his job with
18 Cudahy. A.R. at 471.  First, she explained, Fulayter's symptoms were not reported as acute
19 in the January 15, 2003, medical report provided by Dr. Yorke.  Second, Fulayter was
20 consistently unwilling to consider alternative treatment options and failed to continue a
21 successful physical therapy regimen.  Third, he ceased using narcotic pain medication and
22 now only uses one half of a tablet of Percocet per day, practices which suggest that his pain
23 is not severe.  Fourth, Akey continued, Fulayter has not made frequent office visits to his
24 primary care provider, and his latest medical records reflect that his pain is "0" on a 0-10
25 scale.  Fifth, the activities reported in the Activities of Daily Living Questionnaire indicate
26 an ability to sit for prolonged periods and function mentally.  For these reasons, Dr. Akey
27 concluded that "there is no evidence to support impairment due to low back pain, depression,
28 cognitive impairment or hypertension."  A.R. at 474.

1   Prudential upheld its termination of benefits on February 14, 2006, in light of Dr.
2   Akey's report, the surveillance, and the information provided in the questionnaire.  Fulayter
3   brought this action to challenge Prudential's decision under ERISA, as codified in 29 U.S.C.
4   §§ 1104 and 1132, and now moves for summary judgment under Federal Rule of Civil
5   Procedure 56.

6   **II.   Standard of Review**

7   Typically, summary judgment is appropriate where there is no "genuine dispute of
8   material fact."  Fed. R. Civ. P. 56(c).  "In ERISA actions, however, where the plaintiff is
9   challenging the plan administrator's denial of benefits and . . . [the] abuse of discretion
10   standard of review applies, 'a motion for summary judgment is merely the conduit to bring
11   the legal question before the district court and the usual tests of summary judgment, such as
12   whether a genuine dispute of material fact exists, do not apply.'"  *Farhat v. Hartford Life &*
13   *Accident Ins. Co.*, 439 F. Supp. 2d 957, 966 (N.D. Cal. 2006) (quoting *Bendixen v. Standard*
14   *Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).  Because it is held below that Prudential's
15   decision will be reviewed for an abuse of discretion, the proper inquiry will be whether
16   Prudential abused its discretion in light of the record evidence, not whether there is a genuine
17   dispute of material fact.

18   **III.   Analysis**

19   **A.   Standing**

20   ERISA permits an employee insurance plan "participant or beneficiary" to bring a
21   civil action "to recover benefits due to him under the terms of his plan, to enforce his rights
22   under the terms of the plan, or to clarify his rights to future benefits under the terms of the
23   plan." 29 U.S.C. § 1132(a)(1).  "If [an individual] is not a 'participant or beneficiary' of [a
24   plan under ERISA], he lacks standing to bring . . . claims under 29 U.S.C. § 1132(a)(1)."
25   *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1038 (9th Cir. 2006).  ERISA defines
26   "participant" as "any employee or former employee who is or may become eligible to receive
27   a benefit of any type from an employee benefit plan . . . ." 29 U.S.C. § 1002(7).  A

28

1  "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit

2  plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

3  　　　Although Plaintiffs invoke 29 U.S.C. § 1104, rather than § 1132(a)(1), as the basis for

4  their claim for breach of fiduciary duty, the language of the latter statute may be applied to

5  evaluate standing in actions under the former. *See Pilkington PLC v. Perelman*, 72 F.3d

6  1396, 1398-1401 (9th Cir. 1995). In this case, Plaintiff Sandra Fulayter, Bernard's wife,

7  lacks standing because she is neither a "participant" nor a "beneficiary" within the meaning

8  of § 1132(a)(1). Mrs. Fulayter is not a "participant" because she is not an "employee or

9  former employee" of Smithfield Foods, Inc. 29 U.S.C. § 1002(7). Likewise, she cannot be

10  deemed a "beneficiary" because there is no indication that either Bernard Fulayter or the

11  terms of the Plan designated her as such. 29 U.S.C. § 1002(8). Because an ERISA plaintiff

12  "bears the burden of proving his entitlement to contractual benefits," *Horton v. Reliance*

13  *Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998), and Plaintiffs provide no basis

14  for concluding that Sandra Fulayter has standing to assert a claim, she cannot be a party in

15  Bernard Fulayter's action for the recovery of unpaid disability benefits.

16  　　**B.   *Abatie* Review**

17  　　　A claims determination under an employee benefits plan governed by ERISA is by

18  default subject to de novo review. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th

19  Cir. 1999). However, where the plan "unambiguously provide[s] discretion to [its]

20  administrator" to interpret the terms of the plan and make final benefits determinations, the

21  determination is reviewed for an abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*,

22  458 F.3d 955, 963 (9th Cir. 2006). "The plan administrator bears the burden of showing the

23  plan gives it discretionary authority." *Ondersma v. Metro. Life Ins. Co.*, 2006 U.S. Dist.

24  LEXIS 85460, at *2 (N.D. Cal. Nov. 16, 2006).

25  　　　If plan language warrants de novo review, "[t]he court simply proceeds to evaluate

26  whether the plan administrator correctly or incorrectly denied benefits" in light of all the

27  evidence. *Abatie*, 458 F.3d at 963. However, if the language of the plan triggers review for

28  an abuse of discretion, three stages of analysis will remain. First, it must be determined

1   whether the administrator in fact exercised its plan-authorized discretion in the course of

2   denying the benefits.  If the administrator did not, the denial may be reviewed de novo.  *Id.*

3   at 972.

4          Second, if the administrator both possessed and actually exercised discretion in

5   denying benefits, the precise level of scrutiny with which to review the denial must then be

6   determined.  A denial of benefits should be reviewed with greater scrutiny if a plan gives

7   discretion to an administrator that has a structural conflict of interest due to its status as both

8   administrator and funding source.  *Id.* at 965.  Other factors to consider in determining the

9   appropriate level of scrutiny include evidence of malice, self-dealing, "a parsimonious

10  claims-granting history," inconsistent reasons for denial, inadequate investigation into a

11  claim, failure to credit a claimant's reliable evidence, a history of denying "benefits to

12  deserving participants by interpreting plan terms incorrectly or by making decisions against

13  the weight of evidence in the record," and procedural irregularities.  *Id.* at 968, 972.  Unlike

14  de novo review, review for an abuse of discretion is generally limited to the administrative

15  record before the plan administrator at the time of its decision.  *Id.* at 970.

16         Finally, after determining the appropriate level of scrutiny, that scrutiny must be

17  utilized in deciding whether the administrator actually abused its discretion in denying

18  coverage.  An ERISA plan administrator abuses its discretion if (1) it renders a decision

19  without any explanation, (2) it construes provisions of the plan in a way that conflicts with

20  the plain language of the plan, or (3) it relies on clearly erroneous findings of fact in making

21  benefit determinations.  *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472-73 (9th

22  Cir. 1993).  "The mere fact that the plan administrator's decision is contrary to some

23  evidence in the record does not show that the decision is clearly erroneous."  *Snow v.*

24  *Standard Ins. Co.*, 87 F.3d 327, 331 (9th Cir. 1996).  Rather, "review under the clearly

25  erroneous standard is significantly deferential, requiring a definite and firm conviction that

26  a mistake has been committed."  *Id.*

27

28

### 1.       The Language of the Plan

Prudential has satisfied its burden of showing its own discretionary authority under the insurance Plan. The Plan states clearly that Prudential "as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits." A.R. at 63. Plaintiff concedes as much by offering that "the standard of review in this matter is abuse of discretion." Doc. # 20 at 10. Thus, Prudential's termination of disability benefits will be reviewed for an abuse of discretion.

### 2.       Whether Prudential Exercised Discretion

Plaintiff also rightly concedes that Prudential actually exercised its Plan-established discretion in handling his claim. Prudential terminated Fulayter's disability payments on May 25 after its claim manager, Carrie Eccles, examined the medical record and concluded that no "impairment would prevent [Fulayter] from sitting on a continuous basis with the capability for self-accommodation." A.R. at 346. In handling Fulayter's subsequent appeal, Prudential weighed conflicting conclusions from three physicians who reviewed the claim. Prudential then denied Fulayter's second appeal after evaluating surveillance reports, a questionnaire, and Dr. Akey's report. During each of these stages of review, the decision not to extend Fulayter's disability payments flowed from Prudential's unrestrained evaluation of the factual record, rather than some preexisting rule or policy. This case is therefore unlike others that have applied a standard other than abuse of discretion due to an insurance carrier's failure to exercise discretion clearly authorized in the employee insurance plan. *See, e.g.*, *Boldon v. Humana Ins. Co.*, 2006 WL 3759459, at *8-9, 12 (D. Ariz. Dec. 13, 2006).

### 3.       The Appropriate Level of Scrutiny

Several factors cumulatively warrant a high level of scrutiny in evaluating Prudential's decision to terminate Fulayter's disability benefits. First, a high level of scrutiny is supported, even if only marginally, by the structural conflict of interest created by Prudential's status as both the administrator of the Plan and its funding source. *See Abatie*, 458 F.3d at 965. This conflict creates an "incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in

1    its own coffers." *Id.* at 966.  In this case, there is no evidence of malice, self-dealing, or a

2    parsimonious claims-granting history on the part of Prudential.  Dr. Akey's independent

3    review of the record also concurred with Prudential's medical judgment.  However, the

4    conflict of interest created by Prudential's dual role is "inherent" and must be given some

5    weight "even if merely formal and unaccompanied by indicia of bad faith." *Id.*  The fact that

6    Dr. Akey agreed with the judgment that Fulayter can pursue sedentary employment cannot

7    fully obviate the conflict.  *See Sherry v. Hartford Life & Accident Ins. Co.*, 314 F. Supp. 2d

8    714, 722 (N.D. Ohio 2004).

9         Second, a high level of scrutiny is warranted because Prudential's final decision on

10   February 14, 2006, utilized information freshly gleaned from the Activities of Daily Living

11   Questionnaire and the Research Consultants surveillance reports to assert entirely new

12   justifications for terminating benefits.  The decision letter explained that those sources

13   revealed "several inconsistencies" that undermined Fulayter's claim, including his supposed

14   ability to perform yard work, shop, play poker, watch movies and television, drive an

15   automobile, and walk without a brace. A.R. at 476.  Prudential had not previously relied on

16   any of these stated reasons, as the decision letters from May 25 and August 12 focused

17   exclusively on Fulayter's medical record.  *See* A.R. at 352, 388.  In addition, because the

18   February 14 decision was final,[1] Fulayter had no opportunity to respond.  Prudential's

19   reliance on the questionnaire and reports in such circumstances constituted a procedural

20   irregularity that supports a more skeptical abuse-of-discretion review.  *See Abatie*, 458 F.3d

21   at 974 ("When an administrator tacks on a new reason for denying benefits in a final

22   decision, thereby precluding the plan participant from responding to that rationale for denial

23   at the administrative level, the administrator violates ERISA procedures.").

24

25

---

26        [1] Defendant asserted at oral argument that the February 14 decision was not final, but
27   the record indicates otherwise.  *See* A.R. at 477 ("This decision is final and cannot be
     appealed further to Prudential.  If you still disagree with the above decisions, you may file
28   a lawsuit under the Employee Retirement Income Security Act (ERISA).").

Finally, and perhaps most significantly, a high level of scrutiny is supported by Prudential's failure to conduct an even-handed investigation of Fulayter's condition. While Prudential repeatedly second-guessed or otherwise failed to credit trustworthy evidence of Fulayter's chronic pain and injury, it uncritically accepted even questionable evidence to the contrary. Eccles, a registered nurse, based her May 18, 2005, recommendation to terminate benefits exclusively on a review of Fulayter's "most recent" medical records, omitting any consideration of older records that had led Prudential to grant disability benefits under the broad definition of "disabled" and find only four months earlier that because of "documented chronic intractable pain" and the "progressive" nature of "all the conditions mentioned in Fulayter's medical records," Fulayter "would be extremely unlikely" to obtain gainful employment, "no matter what his education and experience." A.R. at 285. Those older records showed that Dr. Bahal diagnosed class IV RSD and found Fulayter to be so "totally and permanently disabled" as to be incapable of "any type of work, even sedentary work due to side effects from medication, impaired memory, and low back pain which increases with sitting." A.R. at 271. The older records also documented Dr. Bolla's prescription of the powerful narcotic Fentanyl upon Fulayter's complaint of "sharp, burning, shooting, knife-like, numbing, deep, achy pain" in his pelvis and right extremity. A.R. at 227. Prudential provides no explanation as to how a fair evaluation of Fulayter's claim could have possibly disregarded such evidence of disability.

Eccles also failed to credit evidence of Fulayter's disability within more recent medical records, including the very same records that served as the basis for her recommendation. The documents from August 2004 and January 2005 in which Fulayter purportedly "describes his pain as 0/10" show that Fulayter obtained refills on his Percocet prescription for "chronic low back/L hip/R foot pain" and that he used the Percocet to "take[] the edge of the pain off." A.R. at 329, 337. Eccles, however, did not credit either of these unfavorable facts. Nor did she discuss a document dated July 7, 2004, in which it is explained that Fulayter suffers from pain in his left hip, lower back, and right foot. A.R. at 341. In concluding that there was "[n]o indication of any ambulation abnormalities," Eccles

1   similarly failed to credit evidence of unevenness in the height of Fulayter's hips, A.R. at 329,

2   pain from a heel spur in his right foot, A.R. at 343-44, his use of a cane, A.R. at 271, his use

3   of a foot brace, A.R. at 323, and Dr. Bahal's statement that Fulayter has "impaired mobility,"

4   A.R. at 271.

5          Physician reviews subsequently conducted by Dr. Bachman, Dr. Fallon, and Dr. Akey

6   similarly cherry picked helpful pieces of information while failing to credit substantial

7   documentation showing the severe nature of Fulayter's condition.  To reach the conclusion

8   that Fulayter is not disabled, Dr. Bachman only examined one record authored by Edna

9   Harris on January 14, 2005, and Dr. Fallon only interpreted the record from a CT scan

10  performed by Dr. Mark Ellis on July 7, 2005.  These two reviewers disregarded relevant

11  evidence from nearly a dozen prior medical visits, including the conclusions reached by Dr.

12  Bahal and Dr. Bolla based on their direct observation of Fulayter's condition.  In finding that

13  Fulayter's reflux sympathetic dystrophy "seems to have resolved" and that he has "no

14  difficulty ambulating," Dr. Bachman also failed to credit the statement from Edna Harris, the

15  author of the document on which Dr. Bachman's determination was based, that any silence

16  in the record pertaining to Fulayter's pain and ability to walk should not be construed to

17  mean that his conditions had resolved.  A.R. at 356-57.  Dr. Akey's independent review was

18  similarly defective, as it highlighted that Dr. Yorke did not report Fulayter's symptoms as

19  acute in January 2003, but gave no apparent weight to the subsequent observations and

20  diagnoses of Dr. Bahal and Dr. Bolla.  Despite these obvious limitations, Prudential readily

21  relied on the conclusions of these reviewers.

22         Prudential's partisan treatment of the record evidence is perhaps best illustrated by the

23  contrasting manner in which the company considered the recommendation of Dr. K and the

24  surveillance report from Research Consultants.  After Dr. K, Prudential's own physician

25  reviewer, found that "there is a 60-70% chance" that Fulayter is incapable of performing a

26  sedentary occupation, Prudential arranged for additional case reviews by Dr. Bachman and

27  Dr. Fallon.  Once those two physicians concluded that Fulayter was not disabled, Prudential

28  upheld its decision terminating benefits.  In contrast, Prudential ultimately found Fulayter

disabled in part due to hearsay evidence that Fulayter's neighbor had seen him mowing his front lawn. Prudential readily accepted this evidence without conducting any inquiry to verify its accuracy. If Prudential had asked Fulayter about the neighbor's statement, it would have learned that the statement could not have been true because Fulayter does not even have a lawn in his yard. In conjunction with Defendant's structural conflict of interest and the procedural irregularity noted above, such disparate treatment of the evidence based on its tendency to support or undermine the termination of benefits suggests a grave lack of objectivity that warrants close scrutiny approaching de novo review.

### 4.   Whether Prudential Abused its Discretion

#### a.   The finding that Fulayter can perform sedentary employment

Applying the high level of scrutiny required by the findings above, Prudential abused its discretion by terminating Fulayter's benefits based on a clearly erroneous interpretation of the medical record. In part, Prudential denied benefits on the reasoning that "there [was] no documentation of Reflex Sympathetic Disorder" and "no mention of any ambulation abnormalities" in Fulayter's record. A.R. at 352. Yet the record plainly indicates otherwise: Dr. Bahal diagnosed Fulayter with class IV RSD on March 3, 2003. A.R. at 211. In light of the pain related to this condition, Dr. Bolla prescribed Fentanyl for Fulayter one month later. A.R. at 227. In the summer of 2004, Fulayter received an x-ray that revealed degenerative changes in his right foot that require to him to wear an orthotic device. A.R. at 304. The report from Fulayter's visit with Edna Harris in January 2005 describes chronic pain in his pelvis and right extremity and uneven hip placement. A.R. at 329. The record also demonstrates that Fulayter used one-half to one whole tablet of Percocet more than once on a daily basis in 2005, *id.*, that Fulayter currently takes two tablets of ibuprofen and two to three tablets of Endocet per day, A.R. at 413, that Dr. K found a 60-70% likelihood of disability, A.R. at 377, that Fulayter's conditions are progressive in nature, A.R. at 201, and that Edna Harris found Fulayter only able to stand or walk "about 15-20 min at one time for a total of 0-2 hours due to pain," A.R. at 356-57. One of Prudential's own claim managers

1  concluded on this record that Fulayter has "documented chronic intractable pain" due to
2  "progressive" medical conditions.  A.R. at 285.

3      Faced with such evidence, Prudential focused on the absence of detailed descriptions
4  of Fulayter's conditions in his latest medical records to conclude that those conditions must
5  not exist.  It was for two reasons an abuse of discretion to terminate Fulayter's benefits on
6  such reasoning in this case.  First, Prudential knew that Fulayter had been diagnosed with
7  RSD and understood the nature of the condition.  All of the record evidence indicated that
8  Fulayter's RSD was, in Prudential's own words, "progressive in nature."  A.R. at 285.  This
9  was the conclusion reached by physicians who directly observed Fulayter's condition, and
10  it suggested that his disability would not resolve over time.  Prudential had no reason to
11  discount this evidence.  Second, the June 6, 2005, letter from Edna Harris to Prudential
12  explained that any silence pertaining to Fulayter's condition in his recent medical records
13  should not be construed to mean that Fulayter's condition has resolved.  Harris explained
14  from her observation that Fulayter's RSD in fact persists and that she simply chose not to re-
15  measure parameters at each visit because the condition is chronic.  Prudential could only
16  conclude that there was no indication of disability by disregarding Harris's explanation of
17  the record.

18      In support of its determination that the record failed to document disability, Prudential
19  also asserted that Fulayter (1) had a full range of motion on January 14, 2005, (2) described
20  his own pain level as "0/10" on the same date, and (3) voluntarily reduced his dosage of
21  Percocet due to a lack of severe pain.  Prudential's reliance on these pieces of information
22  was also clearly erroneous in light of a broader context of persuasive, contrary evidence.
23  Responding to the first point, Edna Harris clarified that Fulayter "only has full [range of
24  motion] of extremities when wearing [his] ankle brace," A.R. at 356, and Fulayter reports in
25  the September 2005 Daily Living Questionnaire that he still has difficulty walking due to loss
26  of muscle in his right leg, hip and ankle pain, and muscle cramps, A.R. at 410.  Moreover,
27  range of motion has no necessary connection with Fulayter's pain while sitting or
28  standing–the crucial inquiry in determining whether Fulayter can perform sedentary

1    employment.  Pertaining to Prudential's second point, the January 2005 record on which

2    Prudential relied to conclude that Fulayter experiences no pain clearly shows that he has

3    chronic pain and used Percocet to "take the edge of the pain off."  A.R. at 329.  Prudential's

4    exclusive emphasis on an unexplained notation of "0" pain in the vitals section of the record

5    is simply another illustration of its tendency to seize upon any conceivably favorable

6    information without regard to context or contrary evidence.  Fulayter would have had no

7    reason to report chronic pain or request a refill on his pain medication if he no longer

8    experienced pain in the first place.  Finally, with regard to Prudential's last point, the record

9    does indicate that Fulayter reduced his dosage of Percocet.  However, he explains the

10   decision as an attempt to avoid adverse cognitive side effects, rather than a consequence of

11   diminishing pain.  In the questionnaire from September 27, 2005–the last document to

12   discuss his pain level–Fulayter continues to report that he has "severe pain" in his right foot,

13   little strength in his ankle, and broken hardware in his pelvis that creates discomfort when

14   he sits.  A.R. at 410.  He also reports use of ibuprofen and two to three tablets of Endocet per

15   day.  A.R. at 413.  Crucially, the only medical personnel who made any direct observations

16   pertaining to Fulayter's leg, ankle, and hip pain consistently described it as chronic and

17   disabling.  A.R. at 227, 271, 356.

18        Prudential also terminated benefits because the surveillance report and Activities of

19   Daily Living Questionnaire indicated that Fulayter "perform[s] yard work, shop[s] at Wal-

20   Mart, Home Depot, etc., landscape[s his] back yard, mow[s his] lawn, and play[s] poker on

21   a regular basis."  A.R. at 476.  Again, under the strict form of abuse-of-discretion review

22   currently operative, the conclusion drawn from this evidence was clearly erroneous.  The

23   reports that Fulayter performs yard work, mows his lawn, and landscapes his back yard are

24   based on inaccurate hearsay statements from one of Fulayter's neighbors.  In addition, in

25   light of the clinical findings of Dr. Bahal, Dr. Bolla, Edna Harris, and Dr. K, all of which

26   support a finding of disability, the fact that Fulayter is capable of playing poker and going

27   shopping cannot be seen as reasonable bases for concluding that he can carry out sedentary

28   employment, particularly when Fulayter's pain prevents him from living according to a

routine. A.R. at 411.  From the premise that Fulayter feels well enough for some non-taxing activities on an intermittent basis it does not follow that Fulayter can sustain the demands of a standard work schedule, particularly in light of the facts that Fulayter needs help with routine tasks such as dressing and grooming, has an impaired short-term memory, and continues to experience severe pain.

The conclusions of Dr. Bachman, Dr. Fallon, and Dr. Akey do not vindicate Prudential's decision.  The first two physicians had no contact with Fulayter, reviewed only one record each, and disregarded all of the findings of Dr. Bahal and Dr. Bolla–two physicians who directly observed Fulayter's condition.  Dr. Akey's opinion, although independent, relied on some of the factual errors noted above in connection with Fulayter's purported lack of pain in January 2005 and supposed ability to perform yard work.  She also failed to place any apparent weight on Dr. Bahal's diagnosis, the letter from Edna Harris, or the statements from Fulayter relating to his pain and lack of mobility.  To the extent that Dr. Akey articulated additional reasons for denying benefits, they were not relied on or even apparently considered by Prudential.

In sum, Prudential abused its discretion by concluding that Fulayter can perform sedentary employment.  Closely scrutinized, that conclusion was clearly erroneous.  The central defect in Prudential's determination was that it exclusively valued indicia of non-disability, however inaccurate or incomplete or plainly suspect those indicia may have been, and disregarded a broader context of contrary evidence.  The evidence disregarded informs the proper interpretation of the evidence on which Prudential relied and establishes that Fulayter is incapable of sedentary employment.

**b.   The finding that Fulayter can work as a solicitor or supervisor in Las Vegas**

Fulayter also implies without authority or explanation that Prudential abused its discretion by terminating benefits after finding that Fulayter's education, training, and experience reasonably fitted him to work as a telephone solicitor for $14.06 per hour or "supervisor/order taker" for $23.15 per hour in Las Vegas, approximately one hundred miles

1    away from Fulayter's home in Bullhead City, Arizona.  The basis for this argument appears
2    to be Fulayter's belief that the Plan only allows Prudential to terminate benefits after it has
3    found that gainful employment is actually available.

4           Given that working in Las Vegas would entail an approximately 200 mile commute
5    each day, that Fulayter cannot sit for more than fifteen minutes at a time, A.R. at 356, and
6    that the cost of travel would substantially consume Fulayter's relatively meager wage, the
7    two jobs identified by Prudential cannot reasonably be deemed available.  However, "[w]hen
8    a plan does not specifically state that the employer has the duty of ensuring the availability
9    of an alternative job, the court cannot impose such a requirement."  *Block v. Pitney Bowes,*
10   *Inc.*, 705 F. Supp. 20 (D.D.C. 1989), *aff'd*, 952 F.2d 1450 (D.C. Cir. 1992); *see also Duhon*
11   *v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (finding that a similar plan was "not a
12   form of employment insurance" and that "it was not necessary . . . that the administrator
13   'insure the availability of an alternative job'" prior to terminating benefits).  In this case,
14   there is no argument that the Plan's definition of "disabled" hinges upon the empirical
15   availability of suitable employment, rather than Fulayter's theoretical capacity to carry out
16   the duties of such employment.  Moreover, even if the Plan required the actual availability
17   of a "gainful occupation" prior to the termination of benefits, Fulayter carries the burden of
18   showing that no such occupation was reasonably available.  *See Horton v. Reliance Standard*
19   *Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (noting that a plaintiff suing to recover
20   contractual benefits under ERISA "bears the burden of proving his entitlement" to those
21   benefits).  Having received no evidence from Fulayter concerning the possible unavailability
22   of qualifying occupations in Bullhead City, the effective unavailability of gainful
23   employment in Las Vegas is of little consequence.  Thus, although Prudential abused its
24   discretion in concluding that Fulayter can carry out sedentary employment, it cannot be held
25   that Prudential also abused its discretion by only offering to Fulayter information concerning
26   employment in Las Vegas.

27          IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (Doc.
28   # 20) is GRANTED, except that Plaintiff Sandra Fulayter is dismissed from this action.

1    IT IS FURTHER ORDERED that the parties submit a form of judgment by February

2    20, 2007, that provides for past benefits in a stated amount and future benefits at stated rates.

3    In the event of disagreement concerning the judgment, the parties shall submit supporting

4    memoranda to allow the court to make a proper determination.

5    DATED this 6th day of February 2007.

6

7    _____

8    Neil V. Wake
     United States District Judge

1

INDEX

2   I.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3        A. Fulayter's Disability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4        B. Fulayter's Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5        C. Fulayter's Insurance Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6        D. The Termination of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7   II.  Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8   III. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9        A. Standing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10       B. *Abatie* Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11            1. The Language of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

12            2. Whether Prudential Exercised Discretion . . . . . . . . . . . . . . . . . . . . . . . . . 15

13            3. The Appropriate Level of Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

14            4. Whether Prudential Abused Its Discretion . . . . . . . . . . . . . . . . . . . . . . . . 19

15                 a. The finding that Fulayter can perform sedentary employment  . 19

16                 b. The finding that Fulayter can work as a solicitor or supervisor
                        in Las Vegas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17

18

19

20

21

22

23

24

25

26

27

28